(209 P.3d 728)
No. 99,092

SOUTHWIND EXPLORATION, LLC, *Appellee*, v. STREET ABSTRACT
COMPANY, INC, *Appellant*.

Opinion filed June 19, 2009.

*Steven B. Doering*, of Law Offices of Steven B. Doering, of Garnett, for appellant.

*Zackery E. Reynolds*, of The Reynolds Law Firm, P.A., of Fort Scott, for appellee.

Before MCANANY, P.J., GREEN and CAPLINGER, JJ.

MCANANY, J.: In this appeal we are asked to determine whether claims for deficiencies in an abstractor's certificate of title are actionable under the law of torts. Here, the plaintiff proceeded in tort, and the defendant claims that the district court erred in permitting the plaintiff to do so. The defendant also claims the district court erred in admitting opinion testimony and in permitting the plaintiff's claim to be submitted to the jury based upon speculative damages. Our analysis leads us to conclude that the district court did not err in these matters, and the judgment in favor of the plaintiff is affirmed.

Southwind Exploration, LLC (Southwind), sued Street Abstract Company, Inc. (Street), for negligence and breach of implied and express contractual warranties in the preparation of a certificate of title with respect to an oil and gas lease. Southwind alleged that Street failed to conduct an adequate title search and failed to identify the owner of a mineral interest in the property. Prior to trial Southwind dismissed its contract claims and proceeded in tort.

We begin with events in the 1920's. At that time, Union Central Life Insurance Company made numerous farm loans in Eastern Kansas. In the depression of the 1930's, Union Central foreclosed on many of those farm loans and obtained title to the properties. When the properties were resold, Union Central routinely retained a half interest in the underlying mineral rights in the properties. As a result, Union Central wound up with an estimated 25 to 30 mineral interests in Neosho County alone.

One of the properties owned by Union Central in Neosho County, presumably acquired in a foreclosure, was later known as the Mitchell A North property. The records of the register of deeds of Neosho County disclose the following with respect to this prop-

erty. Union Central sold the property to Willard Knox in 1949 and at that time reserved a half interest in the minerals. Thereafter, Union Central entered into oil and gas leases for development of its mineral interest in the property in 1980 and again in 1987. In 1986 the then-current owner of the property, J & K Farms, leased its minerals interest to Greg Blackwood Oil & Gas. By 1987 the property was owned by the Exchange State Bank. The bank sold the property to John and Michael Mitchell that year. The Mitchells (or the inter vivos trust established in 1993) are the current owners of the property, subject to Union Central's half interest in the mineral rights.

Over the years, Union Central paid taxes on its·various mineral interests. The records of the Neosho County Treasurer show that Union Central regularly paid taxes on its mineral interest in the Mitchell A North property. Because of its tax obligation on its various retained mineral interests in the area, Union Central routinely agreed to oil and gas leases to generate some offsetting income.

There was renewed interest and activity in gas production in southeast Kansas in the 1990's. Southwind participated in this activity. In the spring of 2000, Southwind obtained an oil and gas lease that included the Mitchell A North property. After the lease was recorded, Southwind provided a copy of the lease to attorney William Lacy who was engaged in private practice in Yates Center. Southwind requested that Lacy prepare a title opinion on the lease before Southwind spent any money developing the lease. Lacy hired Street, a Yates Center abstract company he had done business with for many years, to provide a certificate of title for the leased property, including the Mitchell A North property. Southwind did not participate in the decision to hire Street and had no specific requirements with respect to the certificate. Southwind was looking to Lacy, the attorney hired for his title opinion.

Several years earlier, in about 1993 or 1994, Lacy had visited with Helen Bowers, the owner of Street, and Kay Jean Brown, an abstractor at Street, about matters that should be included in a certificate of title. With respect to an oil and gas lease, Lacy told them that the certificate should show (1) the deed chain of title from the original land patent, (2) any reservations in the chain of

title, (3) any recorded leases or assignments of leases, (4) any outstanding mortgages or encumbrances, and (5) a statement regarding taxes.

With respect to the lease covering the Mitchell A North property, however, Lacy's secretary provided Street with a note containing the following instructions:

> "Kay Jean,
> "Bill says you will need to go back to the last oil & gas lease prior to this one. Neosho County property.
> "Build certificate of title on this —
> "Karen."

Street prepared and submitted to Lacy its certificate of title. The certificate begins with the following representation:

> "We, the undersigned, being duly licensed and bonded abstracters in and for said county and state, do hereby certify that we have examined the records in the office of the Register of Deeds, County Treasurer and District Court, affecting the title to the following described real estate. . . ."

The certificate ends with the following disclaimer:

> "This Certificate is made upon the mutual understanding that the maker thereof has not examined all instruments and proceedings in the chain of title to the above described real estate; that such certificate is not a guarantee of title and that the maker thereof shall not be liable for defects in the title to above described real estate."

The certificate makes no mention of the interest of Union Central.

Based upon Street's certificate of title, Lacy rendered a title opinion for Southwind. Thereafter, Southwind drilled and completed four gas wells on the Mitchell A North property at a cost of $180,701.62. Southwind then sought to obtain financing for its operations and offered to its lender a number of leases, including the lease on the Mitchell A North property, as collateral. The lender engaged Locke-Neosho Abstract Company to prepare a title certificate. Locke's title search disclosed Union Central's interest. It also was learned that in 2001 Union Central entered into an oil and gas lease for the Mitchell A North property with Devon/Explorer.

Because Southwind had entered into a lease with the owner of only a half interest in the gas located on the property, Southwind was required to pay the value of half of its net production from the Mitchell A North lease to Union Central, the owner of the other half. When Edwin Bideau, an attorney working for Southwind, approached Devon/Explorer in an effort to obtain a lease on the other half, Devon/Explorer had no interest in doing so. So Southwind continued to pay Union Central for half of the net production from the lease until the lease was sold to Petrol in 2004.

Prior to trial, Street moved in limine to bar the testimony of Southwind's designated expert, Darlene Sears. Street argued Sears lacked the requisite expertise to qualify as a witness because she was not aware of industry practices outside her own office. Street's motion was denied.

The case was submitted to the jury on a theory of negligence. Southwind claimed Street was negligent in failing to examine the records of the county treasurer and county register of deeds to identify Union Central's interest and in supplying false information for the guidance of Southwest and Lacy regarding the ownership of mineral interests in the property. Street denied it was at fault and claimed that Southwind was at fault in accepting Lacy's title opinion with the limitations it contained, and that Lacy was at fault in the manner in which he ordered the title certificate and in relying on Street's certificate of title notwithstanding its limitations.

The jury assessed no fault against Southwind but found Street to be 70% at fault and Lacy to be 30% at fault. The jury found Southwind sustained damages of $329,043.47. Reducing the award by the 30% assessed against Lacy, the district court entered judgment against Street for $230,330.43.

Street appeals.

*Liability in Tort*

The essence of Street's complaint is that the district court erred in submitting this case to the jury on a theory of negligence rather than breach of contract. We find no case authority dealing with the obligation of abstractors in the context of a certificate of title.

When it comes to claims of negligent misrepresentation of the condition of real estate, the court in *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604, 876 P.2d 609 (1994), considered the issue in the context of a claim against the seller's sales agent. The court adopted Restatement (Second) of Torts § 552 (1976), which provides:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it;

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

"(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them."

The duty of an abstractor when preparing an abstract of title for use in the issuance of a policy of title insurance was considered in *Bender v. Kansas Secured Title & Abstract Co.*, 34 Kan. App. 2d 399, 119 P.3d 670 (2005). *Bender* involved the purchase of unimproved acreage. Chicago Title Insurance Company issued a title commitment, and Kansas Secured Title & Abstract Co. served as Chicago Title's agent and abstractor. Following the closing and the issuance of Chicago Title's policy, Bender discovered a blanket pipeline easement in favor of Williams Pipeline Company that had not been disclosed in the title commitment and was not listed as an exception in the title policy. Chicago Title conceded that Kansas Secured Title had not discovered the easement in its title search. This court noted:

"In Kansas, an abstractor is liable for all negligent errors and omissions not only to his or her employer but to all persons who purchase or invest in land relying on an abstract furnished for that purpose and without regard to privity. *Ford v.*

*Guarantee Abstract & Title Co.*, 220 Kan. 244, 259, 553 P.2d 254 (1976), *disapproved in part on other grounds Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 78, 652 P.2d 665 (1982). Accordingly, in the most typical real estate transactions, the purchaser who suffers failure of title after requiring a title commitment as a condition of purchase has a claim based in contract against the title insurer and a claim based in tort against the abstractor." *Bender*, 34 Kan. App. 2d 410.

The Restatement and *Bender* teach that an abstractor's obligation extends beyond its immediate contact, the requesting lawyer or title insurance company, to that "limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it." Restatement (Second) of Torts § 552. That obligation—here; to Southwest—required Street to review the public records relating to the condition of the title to this property in a nonnegligent fashion.

Street contends, however, that it did what Lacy instructed it to do: examine the state of the title beginning with the "the last oil & gas lease prior to this one," as stated in the note from Lacy's secretary. Since the creation of Union Central's interest preceded "the last oil & gas lease prior to this one," Street argues it is not responsible for the omission. Here, Street certified that it had examined the records at the office of the Neosho County Treasurer. Notwithstanding any limitation in the note from Lacy's secretary, a careful examination of the county treasurer's records since "the last oil & gas lease prior to this one" would have disclosed Union Central's regular payment of taxes on its mineral interest in the Mitchell A North property. This put Street on notice of Union Central's interest. Street failed to note Union Central's interest and failed to disclose it in its certificate.

Street properly notes that *Bender* involved the preparation of an abstract and not merely a certificate of title. Street argues that there is no law mandating what records must be reviewed in constructing a certificate of title, while an abstract is required to include all instruments touching upon the chain of title. Clearly, a certificate of title is not an abstract of title. However, this does not explain or excuse Street's failure to find and disclose Union Central's interest for which there was evidence in the county's public records during

the time period of the search defined by the note from Lacy's secretary. The testimony points out that the use of abstracts and lawyers' opinions on abstracts have declined and the use of title insurance has increased over the years. In *Bender*, the property buyer looked to the title insurance company and the title insurance company looked to the abstractor to determine that the property was free of objectionable liens and encumbrances. Here, Southwind looked to Lacy and Lacy looked to Street. The abstractor in *Bender* was liable in tort to the buyer for its negligent nondisclosure of the blanket easement. Given the Restatement provision our Supreme Court adopted in *Mahler*, we see no justifiable reason why Street should not similarly be responsible to Southwind in tort for its negligent nondisclosure of Union Central's interest.

Accordingly, we conclude that the district court did not err in submitting to the jury Southwind's claim of negligence.

### Expert Testimony

Street contends that Southwind failed to establish an applicable standard of care and a deviation from that standard by a qualified expert witness. Street claims Darlene Sears was not qualified to testify as an expert because she had no knowledge of abstracting standards outside her own office. Sears was the abstractor at Locke-Neosho Abstracts, Inc., who uncovered Union Central's interest in the course of the search requested by Southwind's lender.

The qualifications of an expert witness and the admissibility of expert testimony are matters within the broad discretion of the trial court, and its determinations will not be disturbed absent an abuse of that discretion. See *Dieker v. Case Corp.*, 276 Kan. 141, Syl. ¶¶ 1-2, 73 P.3d 133 (2003). As stated in *State v. Waufle*, 9 Kan. App. 2d 68, 74, 673 P.2d 109 (1983):

" 'A witness, in order to be competent as an expert, must show himself to be skilled or experienced in the business or profession to which the subject relates. There are no precise requirements as to the mode in which skill or experience shall have been acquired. . . . A witness may be competent to testify as an expert although his knowledge was acquired through the medium of practical experience rather than by scientific study and research.' "

Sears had been a licensed abstractor in the community for more than 20 years. She attended continuing education courses. She was familiar with the practices of other abstractors. She was engaged in the same business as Street. She examined the title to the Mitchell A North property and was the one who discovered Union Central's interest. The jury was instructed that the standard of care "is established by members of the same profession in the same or similar communities under like circumstances." Sears clearly satisfies this test. Street's criticisms of Sears more properly address the weight to be given her testimony rather than its admissibility. We conclude that the district court did not abuse its discretion in admitting Sears' testimony.

Street also complains that Sears testified that no matter what she had been instructed to do, she would have examined the entire chain of title to determine if any minerals had been severed from the property. We fail to see how Street was prejudiced by this testimony since, as noted earlier, the evidence established that Union Central's interest should have been discovered by examining current public records without examining the title back to the 1872 land patent.

*Speculative Damages*

Finally, Street argues Southwind's damages calculation was speculative because it was based upon an unproven assumption that Southwind would have been able to obtain a lease from Union Central had Union Central's interest been disclosed in Street's certificate of title.

Damages need not be established with absolute certainty. Nevertheless, a damages claim must be supported by evidence that is not conjectural or speculative. See *McKissick v. Frye*, 255 Kan. 566, 591, 876 P.2d 1371 (1994). In considering Street's argument, we examine the record in the light most favoring Southwind, the prevailing party, to determine if there is evidence supporting the jury's damages calculation. *Shirley v. Smith*, 261 Kan. 685, 694, 933 P.2d 651 (1997). As noted earlier, the testimony established that because of its tax obligations on its various retained mineral interests in the area, Union Central routinely agreed to oil and gas

leases to generate some offsetting income. The uncontroverted evidence establishes that Southwind and others in Neosho County had a good working relationship with Union Central and had no difficulty obtaining leases from the company in the past. There is nothing in the record to indicate that intervening time or events changed Union Central's policy regarding its willingness to negotiate oil and gas leases on the various mineral interests it retained in Neosho County. Street fails to demonstrate that Southwind's damages calculation was predicated upon conjecture and speculation. The district court did not err in submitting Southwind's damages claim to the jury.

Affirmed.